Filed 4/16/13  Rush v. City of Oakland CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| KARLA M. RUSH,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND et al.,<br><br>          Defendants and Respondents. | A134024<br><br>(Alameda County<br>Super. Ct. No. RG09477417) |

Former Oakland Police Officer Karla M. Rush sued the City of Oakland (the City) and the Oakland Police Department (OPD) for gender discrimination after the City terminated her employment following an internal investigation of false search warrant affidavits executed by Rush and other OPD officers.  Defendants moved successfully for summary judgment, and Rush appeals.  We affirm the judgment in favor of defendants.

## I.  BACKGROUND

Rush was hired as a police officer by OPD in June 2000, and terminated from her employment in April 2009.  She sued OPD and the City in October 2009, alleging her gender was a motivating reason for her termination in violation of the California Fair Employment and Housing Act (Gov. Code, § 12940 et seq.; FEHA).  Defendants moved successfully for summary judgment in 2011, and this timely appeal followed.

In their motion for summary judgment, defendants alleged the following facts were undisputed:

In September 2006, Rush became a problem-solving officer in district 5 (PSO 5), a position she held until her termination.  In the summer of 2008, Rush was the subject of

multiple internal affairs division (IAD) investigations begun in response to citizen complaints about search warrants executed at their homes. During these investigations, it was discovered Rush had submitted search warrant affidavits containing untruthful information. Rush's affidavits falsely asserted suspected narcotics obtained during what is known as an "X buy" had been tested by the OPD's crime lab when, in fact, they had not been tested.[1] The scope of the IAD investigation expanded when it was discovered that additional false search warrant affidavits were authored by Rush as well as 18 other officers.

The investigator was asked to determine if the subject officers violated two specified rules in OPD's "Manual of Rules": (1) "REPORTS AND BOOKINGS" ("No member or employee shall knowingly falsify any official report or enter or cause to be entered any inaccurate, false or improper information in the records of the Department"); and (2) "TRUTHFULNESS" ("Members and employees are required to be truthful at all times whether under oath or not"). The investigator interviewed all of the subject officers, 22 witness officers, two vice charging officers, six current and former criminalists in the crime lab, and confidential informants involved in the X buys in question. Rush was interviewed three times and was represented by an attorney at all three interviews.

The IAD investigator established that the crime lab does not test all suspected narcotics it receives. Suspected drugs are typically not tested absent a request for testing made by an officer either directly to a lab criminalist or through the narcotic vice charging officers. It is the officer's responsibility to follow up with the lab to find out the results of any drug analysis requested. Many of the subject officers, including Rush, mistakenly believed submission of a narcotics envelope constituted a request for drugs to be tested, or that if they obtained a tracking number ("D number") for the submission,

---

[1] An X buy occurs when an officer uses a confidential informant to purchase suspected narcotics at a location where the officer believes narcotics are being sold. The purpose of conducting an X buy is to gather probable cause to obtain a warrant to search the location for narcotics.

this constituted proof the suspected drugs had been tested.[2] But Rush was the only subject officer who did not believe she needed to follow up with the lab to find out the *results* of the drug test before asserting in search warrant affidavits that the drugs had been tested. She stated she believed the crime lab tested all suspected drug evidence it received even though she also admitted that, on more than one occasion, she had been called to testify in court and her testimony was delayed because the drug evidence had *not* been tested by the lab.

From March 2007 through August 2008, Rush prepared 40 X buy search warrant affidavits. In 35 of the warrants, the suspected drugs were never tested by the crime lab. In another four, the suspected drugs were tested, but not until after the search warrant was issued. For one warrant, it could not be determined whether the test occurred before or after the issuance of the warrant. Rush's 39 confirmed false search warrant affidavits were far more than any of the other subject officers. Fifteen of the subject officers had three or fewer untruthful affidavits, and the officer with the second highest number of false search warrants had 10.

Like other officers, Rush used templates to prepare her search warrant affidavits. In her earlier affidavits she stated a "presumptive test" was conducted at the crime lab or the Eastmont Substation "which yielded that [the suspected cocaine or other drug] indeed contained [cocaine or other drug]." Rush's later search warrant affidavits represented that "[a] test was conducted on the narcotics, which yielded that it indeed contained [the suspected drug]." When questioned about her use of the term "presumptive test," Rush stated she believed a presumptive test was her visual inspection of the substance purchased by the informant. The IAD investigator did not find Rush to be credible on this point.[3] Even when she used the later affidavit template without the "presumptive

---

[2] Rush was not one of the officers who asserted the so-called "D number defense." Assignment of a D number in fact had nothing to do with whether the evidence had been tested.

[3] The investigator cited three grounds for his credibility finding. First, the majority of the other officers interviewed (including witness officers) understood a

test" language, Rush claimed the "test" it referred to was still her visual inspection. She admitted the statement the suspected drugs "indeed" tested positive in that template was "extremely vague" and was a "strong statement" suggesting it was based on a chemical test report rather than "just my assumption, visual inspection" of the suspected drug.

The IAD investigator ultimately concluded Rush violated the OPD's rules on "Reports and Bookings" and "Truthfulness" due to her submission of 39 false search warrant affidavits. The investigator also sustained charges of misconduct against 13 other subject officers. During the same time period, Rush was also the subject of an IAD investigation concerning allegations of false arrest in connection with another search warrant she executed, made by residents of the home searched. That investigation concluded Rush arrested the residents without probable cause and obtained the search warrant based on false information.

IAD recommended all of the officers who received sustained findings for violation of the "Reports and Bookings" and "Truthfulness" rules be terminated pursuant to the OPD's discipline policy. Under the policy, termination is the only penalty available for officers who violate these rules, even if it is a first offense. Termination for untruthfulness is also the "industry standard" in the law enforcement field. It is understood any sustained finding of untruthfulness against an officer must be disclosed to the defense under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) in any case in which the officer testifies.[4] The OPD issued notices of proposed termination to 11 officers, including Rush, who were found to have violated the subject rules.

---

presumptive test is performed by officers with a portable chemical testing kit. Second, the officer Rush identified as her mentor testified it was his practice to use these kits and he believed Rush was aware of that. Third, given Rush's narcotics enforcement experience, it seemed unlikely she did not understand what a presumptive test was.

[4] Ultimately, seven of the officers with a sustained finding of untruthfulness were not terminated. Three of the 10 male officers were disciplined with a one-day suspension for performance of duty violations.

An outside hearing officer was retained by OPD to provide the subject officers the opportunity to respond to the proposed discipline.[5] The hearing officer concluded only three of the officers, including Rush, should be terminated. In April 2009, the City terminated the employment of Rush and three other officers based on the investigative findings of IAD and the recommendations of the chief of police and outside hearing officer. The fourth officer terminated, a male, was terminated notwithstanding the hearing officer's recommendation because OPD believed the hearing officer misunderstood the facts of that particular case. A fifth officer, also male, who had been on medical leave during the main investigation, was terminated in September 2009, for submitting false search warrant affidavits.

The Oakland Police Officers' Association (OPOA) grieved Rush's termination through a six-day binding arbitration proceeding in 2010, on the question of whether the City had just cause to terminate her employment. The arbitrator concluded it was not plausible Rush believed mere submission of a drug envelope meant a test had been conducted and the test revealed the substance to be a narcotic. The arbitrator accordingly concluded the statements in the affidavits that a drug test had been conducted and it revealed the contents of the envelope "indeed" contained narcotics were made knowing they were untrue. Regarding Rush's claims concerning her understanding of the presumptive test language in some of the affidavits, the arbitrator noted the affidavits lacked any description of any physical examination or visual test Rush conducted of the suspected narcotic. The arbitrator rejected OPOA's assertion Rush's misconduct was caused by a lack of training, stating "[t]elling the truth is not a matter of training," and Rush was not being terminated for failing to follow OPD procedures but for untruthful statements presented to judges to obtain search warrants.

The arbitrator also rejected OPOA's claim Rush was treated more severely than the male officers, finding her 39 false affidavits "clearly set her apart from the other

---

[5] Commonly known as a *Skelly* hearing, this procedure is required by due process considerations when a public employer proposes to discipline an employee. (See *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*).)

5

officers," and noting OPD recommended termination of all 11 officers who received sustained findings for submitting false reports. Regarding the effect of *Brady*, the arbitrator concluded the findings that Rush submitted untruthful affidavits in conjunction with 39 search warrants would have to be disclosed to defense attorneys, would hamper the prosecutor's ability to rely on Rush as a witness, and constituted "serious misconduct" regardless of its *Brady* implications.

## II. DISCUSSION

Rush contends she came forward with evidence of a prima facie case of gender discrimination, as well as evidence from which a rational trier of fact could infer intentional discrimination.

### A. *Applicable Law*

In cases alleging adverse employment actions in violation of FEHA, the trial courts apply the same three-stage, burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment. (See *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 (*McDonnell Douglas*).) The plaintiff bears the initial burden to establish a prima facie case of discrimination. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68.) "Generally the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was . . . performing competently in the position he held, (3) he suffered an adverse employment action, such as termination . . . , and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).) The specific elements of a prima facie case may vary depending on the particular facts. (*Ibid.*)

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to produce admissible evidence its action was taken for a legitimate, nondiscriminatory reason. If the employer meets this burden, the presumption of discrimination is dispelled and it becomes the plaintiff's burden to prove the employer's proffered reasons were pretexts for discrimination or to offer any other evidence of discriminatory motive. (*Guz, supra*, 24 Cal.4th at pp. 355–356.)

6

The fact finder may consider the evidence establishing the prima facie case and inferences properly drawn from that evidence on the issue of whether the employer's justification is a pretext. (*Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 143.) But the plaintiff must do more than establish a prima facie case and deny the credibility of the employer's witnesses. The plaintiff must produce specific, substantial evidence of pretext, and a triable issue of fact can be created only by a conflict of evidence, not by speculation or conjecture. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.)

To show pretext, the plaintiff cannot simply show the employer's decision was wrong, mistaken, or unwise. The evidence must expose such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's explanation for its actions that a reasonable fact finder could rationally find those explanations unworthy of credence, and thus infer the employer acted for other reasons it chose not to reveal. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*).)

In the summary judgment context, the burdens are reversed. "Commonly, an employer will seek summary judgment, arguing that the plaintiff has not satisfied one of the four elements of the prima facie case and thus is not entitled to proceed to trial, or that there is no disputed issue of material fact regarding the motivation behind the adverse employment decision." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 202.) "If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." (*Id.* at p. 203.)

**B. *Rush's Prima Facie Case***

There is no dispute Rush was a member of a protected class and suffered an adverse employment action. Defendants maintain, however, there was no triable of issue of material fact with respect to whether Rush was performing competently as a police

officer or whether any circumstances existed suggesting her termination was motivated by her gender.

As to the issue of Rush's job performance, defendants point to the undisputed evidence Rush had multiple sustained allegations of misconduct at the time of her termination, as well as sustained allegations she had arrested two citizens without probable cause. Further, those findings had been upheld by an outside hearing officer, and an arbitrator had recommended she be terminated after binding arbitration. Rush cites evidence her direct supervisor and her coworkers believed she was a hard worker, and was competently performing the duties required by her position when she was terminated.

The burden of establishing a prima facie case of discrimination is not onerous. (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 253.) It is designed to eliminate only the most patently meritless claims. (*Guz, supra*, 24 Cal.4th at p. 354.) Consistent with that standard, some courts distinguish between misconduct on the job that might be grounds for termination and the minimal competence in job performance required to make a prima facie showing of discrimination. (See, e.g., *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 167–168 (*Wills*); *Sista v. CDC Ixis North America, Inc.* (2d Cir. 2006) 445 F.3d 161, 171–172; *Owens v. New York City Housing Authority* (2d Cir. 1991) 934 F.2d 405, 409 (*Owens*).) As stated in *Owens*: "We have no doubt that . . . misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by *McDonnell Douglas*." (*Id.* at p. 409.)

The record in this case discloses Rush received very positive performance evaluations before the inception of the IAD investigations. The arbitrator concluded Rush had "conducted herself as a professional police officer" during her career, although this did not negate the good cause the arbitrator found the City had to terminate her

8

employment. In our view, Rush met her prima facie burden to show she performed competently in her job. At the same time, the evidence of Rush's misconduct on the job meets the City's burden to show a legitimate, nondiscriminatory reason for discharging her, placing the burden on Rush to show this reason was pretextual. (See *Wills*, *supra*, 195 Cal.App.4th at p. 171.)

With regard to the fourth required element of her prima facie case—the existence of a circumstance suggesting a discriminatory motive—Rush asserts there was evidence similarly situated male employees were treated more favorably. She focuses on the fact the City allegedly did not terminate all of the male officers who submitted false warrant affidavits, but only those officers who, unlike her, were also found to have lied to IAD. While there is good reason to question whether the record supports this assertion, we will assume Rush has met her minimal prima facie burden of showing *some* circumstance arguably *suggesting* discriminatory motive. We proceed to consider whether OPD has come forward with a legitimate, nondiscriminatory reason for discharging Rush and whether Rush met her burden of coming forward with "substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant, supra*, 57 Cal.App.4th at p. 1005.)

Rush effectively concedes the City has offered a legitimate, nondiscriminatory reason for discharging her, namely, her submission of false search warrant affidavits.[6] She contends there are triable issues of fact as to whether the City's stated reasons were nonetheless pretextual because she came forward with (1) substantial evidence she was held to a higher standard and punished more severely than male coworkers found to have engaged in the same conduct; and (2) other evidence of inconsistency, pretext, and gender bias within OPD.

---

[6] The City terminated Rush not only for the false affidavits but also for sustained IAD findings, after an investigation resulting from a citizen complaint, that she arrested two citizens without probable cause stemming from a false search warrant affidavit.

**C.** *Disparate Treatment Evidence*

To support her claim she was held to a higher standard than male officers, Rush asserts four male officers (designated Nos. 3, 4, 12, and 16) committed more egregious misconduct than her—lying in the IAD investigation—yet were not terminated. The evidence simply does not support the disparate treatment claim Rush is trying to make relative to these officers. First, there is no substance to her assertion she was truthful during the IAD investigation whereas the male officers lied. The IAD report on Rush's false warrants stated the preponderance of the evidence showed Rush "was untruthful in her interviews with investigators," and made a specific finding to that effect. The notices of proposed termination sent to Rush in connection with both the false affidavit and arrest without probable cause investigations stated, "[I]t was determined that you were untruthful" in the investigations. Second, the four male officers had submitted a total of eight false warrant affidavits between them, while Rush had submitted 39 false affidavits, and had an additional sustained finding—resulting from a citizen complaint—of making two arrests without probable cause. There is simply no substantial evidence on this record from which a reasonable jury could conclude Rush's gender, not the extent and seriousness of the findings against her, was the reason the City treated her more harshly than the other officers she cites.

Additionally, OPD did not initially recommend lighter punishment for three of the four male officers Rush mentions. It recommended termination of these officers as well, even though they were responsible for only a fraction of the number of false affidavits for which she was responsible. It relented as to these officers only after the outside *Skelly* officer recommended they be exonerated. Rush has no complaint that OPD treated her unfairly in making its initial recommendations that 12 officers be terminated. She objects solely to OPD's decision to mostly follow the recommendations of the outside *Skelly* officer, Edward Kreins, that termination was not in fact warranted in 8 of the 11 original termination cases. As explained by Lieutenant Sean Whent (who supervised the IAD investigation), OPD's decisions about which terminations to pursue after the *Skelly* hearings were based on tactical judgments about the likelihood the City would prevail in

10

arbitration with the OPOA in the face of an adverse *Skelly* hearing result.[7] Rush dismisses that explanation. She characterizes Kreins as a mere "tool to implement the discriminatory intent" of Whent and OPD Chief Howard Jordan. But we find no evidence in the record to support this claim. Kreins was not an OPD employee and there is no evidence he was beholden to or influenced by Whent or Jordan. Considering that Kreins rejected most of OPD's recommendations, the evidence is, if anything, to the contrary.[8] If there was no discriminatory intent shown by OPD's initial recommendations, as Rush concedes, and no evidence OPD manipulated the *Skelly* officer's recommendations or responded to them in an inconsistent manner, her gender discrimination theory falls apart.

Rush further contends she was the only officer terminated based on a finding she "should have known" her affidavits contained false information whereas the male officers who claimed not to fully comprehend the language in their affidavits (designated by Rush as Nos. 8, 13, and 15) were not terminated due to what they "should have known." This mischaracterizes the evidence. OPD initially recommended termination of all of the officers in question. The male officers were alleged to be responsible for 12 false affidavits between them compared to Rush's 39 false affidavits. The *Skelly* officer recommended against termination of the male officers because he found Officers Nos. 8, 13, and 15 committed no deliberate or knowing violation of rules and did not falsify any affidavits. In boilerplate language, he noted these officers were "remiss in not fully understanding the ramifications of the language in the affidavits." Similar language suggesting negligence or sloppiness in submitting affidavits without understanding their

---

[7] OPD's concerns proved to be prescient. In the four cases where OPD followed the *Skelly* officer's recommendation to terminate an officer, the termination was upheld in arbitration or otherwise became final. In the one case where OPD sought termination notwithstanding the *Skelly* officer's recommendation for lighter discipline, the City lost the ensuing arbitration.

[8] Whent testified he had never heard of Kreins before he was chosen to conduct the *Skelly* hearings. He thought Kreins had been a chief of police in Beverly Hills or somewhere else in Southern California.

11

contents also appeared in the *Skelly* officer's findings as to all three of the officers he recommended for termination, including Rush, but in all three cases the officer also found persuasive evidence of untruthfulness.

In Rush's case, the *Skelly* officer acknowledged Rush's contentions that she did not always read the affidavits and that her actions were the result of poor training and mistakes rather than malice. He nonetheless found her actions were deliberate as well as negligent and reckless, and that she was untruthful in her affidavits, both in her use of template testing language and in averring on four occasions that she observed the confidential informant go to the front door of the target residence, which she admitted was untrue. Although he also found Rush "remiss in not fully understanding the ramifications of the language in the affidavits," this was plainly not the basis for his recommendation of dismissal. No substantial evidence in the record supports Rush's claim she alone was terminated because she "should have known" her affidavits contained false information. She was terminated because she either knew the affidavits were false or was, at minimum, recklessly indifferent to whether they were true or false, and because the City was confident it could prove this if the matter went to arbitration.

Rush further contends she was terminated in part because the IAD investigation and *Skelly* officer found she did not have a "credible" understanding of the "presumptive test," whereas a male officer with the same understanding as Rush's (Officer No. 8) was not terminated. In fact, the IAD investigator found Rush was being untruthful when she claimed not to know what a presumptive test actually was. The basis for this finding was that she (1) was mentored by a more experienced officer who was very familiar with presumptive tests and was sure he had shown Rush how to perform such tests, and (2) she had worked for two years in an environment in which it was very unlikely she would not have learned about this subject. The IAD report stated: "Based on [Officer No. 15's] statement and the close working relationship between him and Rush, it is reasonable to conclude that Rush had more knowledge of chemical tests than what she led IAD and CID investigators to believe. . . . It defies logical reasoning that with Rush's knowledge

12

base in the area of narcotics and being immersed in the environment that she was in, that she would have no understanding of what a presumptive test truly was."

Officer No. 8 by contrast authored a total of eight drug warrant affidavits, of which only two were in issue in the IAD investigation. In both cases, the warrants incorrectly represented that drugs *turned into the crime lab* had tested positive. One was tested after the date of the affidavit, and the other was never tested. The officer claimed the affidavits were not false because he had conducted his own *chemical* tests on the drugs in those cases, but the investigator found the officer's defense disingenuous for multiple reasons. Under questioning by IAD, Officer No. 8 had claimed to believe the term "presumptive test" meant only a visual inspection as opposed to a chemical test, which was possibly a fabrication to avoid having to explain why he had not used the template language referring to presumptive testing of the suspected narcotics. It is impossible to draw any conclusions about Officer No. 8's veracity or sincerity on this point from the short excerpt of the officer's interview Rush provides. In any event, IAD focused on other improbabilities in his defense and did not mention his claimed misapprehension about "presumptive tests" in concluding Officer No. 8 was being untruthful and recommending his termination. The *Skelly* officer for his part found there was no evidence Officer No. 8 did not test the drugs himself, and recommended lighter discipline. We fail to see how Officer No. 8's circumstances are probative of gender discrimination or inconsistent treatment by the City. He was responsible for two false warrants compared to Rush's 39. Unlike in Rush's case, there was no direct connection between the falsity of Officer No. 8's two warrant affidavits and the sincerity of his purported beliefs about presumptive testing. In any event, OPD believed both officers had knowingly submitted false affidavits and would have terminated both of them but for the practical difficulty of overcoming the *Skelly* officer's rejection of OPD's findings on Officer No. 8.

Rush claims disparate treatment based on the asserted fact that some of the male officers (designated as Officers Nos. 7, 11, 13) were excused for their false affidavits due to inadequate training, but Rush was not. We note first the three officers were accused of

executing one false affidavit each, compared to 39 executed by Rush. Further, two of the three officers were not excused by OPD for lack of training, but were originally recommended for termination by OPD. In the case of the third officer, Officer No. 7, the warrant was his first and only X buy. He worked under Rush's tutelage who assured him it was okay to get the warrant after dropping the suspected drugs off at the crime lab and getting a D number. On these facts, the IAD investigator found insufficient evidence to conclude Officer No. 7 intentionally submitted a false affidavit. Officers Nos. 11 and 13 were recommended for light or no discipline by the outside *Skelly* hearing officer. In the case of Officer No. 11, Kreins emphasized the insufficiency of the evidence the officer was lying, not inadequate training, as his reason for recommending no discipline. Officer No. 13 was recommended by IAD for termination based on the only search warrant affidavit he authored in which a warrant was issued by a judge. Another officer had assisted him in preparing the affidavit and had supplied the lab testing language that was false. Officer No. 13 claimed he did not review the affidavit before signing it and was unaware of the language. Kreins emphasized the officer's inexperience and recommended lighter discipline based on the officer's failure to read the affidavit. The inference of gender discrimination Rush proposes we draw from the evidence concerning these officers is simply not reasonable.

In sum, we find Rush did not come forward with substantial evidence she was treated more harshly in the City's disciplinary process than similarly situated male officers.

**D.** *Other Evidence of Pretext and Bias*

Rush claims OPD's "stated reason for terminating" her—that she "did not fully comprehend the language of the warrants"—was pretextual because that was a training issue and not grounds for termination. We emphatically reject the premise of Rush's argument. She was terminated for knowingly submitting 39 false affidavits, lying to investigators, and other acts of untruthfulness in connection with the false arrest and other investigations. Rush mischaracterizes Sean Whent's deposition testimony to support her premise. He did not testify she was terminated because she should have had a better

14

understanding of the language in the affidavits. Whent testified he personally believed Rush may not in fact have read or reviewed the affidavits she signed under penalty of perjury but that she nonetheless routinely signed them without any regard for whether they were true or false. This is a truthfulness issue, not a training issue, and does not in any way support an inference of pretext. While one or two phrases in the lengthy paper trail leading to Rush's dismissal reference arguably negligent conduct, *in addition to* multiple findings of untruthfulness, these isolated phrases are insufficient to support an inference of pretext.

Finally, Rush contends the trial court erred in failing to consider certain evidence of gender bias in OPD, consisting of general comments about issues facing female officers. She argues such evidence should have been considered "in combination with substantial evidence [she offered] that similarly situated male officers were treated more favorably . . . and . . . the Defendants' reasons . . . were pretextual." We disregard the hearsay evidence Rush offered of comments purportedly made to her by Lieutenant Sharon Williams about female officers having to work harder. The City timely objected to the evidence, the court sustained the objection, and we find no error or abuse of discretion in that ruling. The other evidence to which Rush refers suggests at most that female officers in OPD, like female employees in a variety of other institutional settings, face greater challenges in working conditions and promotions than male officers. We do not believe such evidence, standing alone, is sufficiently substantial to create a triable issue of fact as to whether gender discrimination was a motivating factor in Rush's termination.

### III. DISPOSITION

The judgment is affirmed.

15

                        _____

                        Margulies, Acting P.J.

We concur:


_____

Dondero, J.


_____

Banke, J.